UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AUTUMN EATON,<br>    *Plaintiff*, | ) <br> ) <br> ) | |
| *vs.* | ) <br> ) | 1:08-cv-01318-JMS-DML |
| INDIANA DEPARTMENT OF CORRECTIONS,<br>PENDLETON JUVENILE CORRECTIONS<br>FACILITY,<br>    *Defendant*. | ) <br> ) <br> ) <br> ) | |

## ORDER

Presently before the Court is Defendant's motion for summary judgment (the "Motion for Summary Judgment"). [Dkt. 48.]

### BACKGROUND[1]

On or around April 14, 2006, Autumn Eaton began working as a correctional officer at Pendleton Juvenile Correctional Facility ("Pendleton"). [Dkt. 49-1 at 9, 2, 7.] For the first year of her employment, her duties involved walking around the "D complex" portion of the facility in order to monitor the residents; these walks were called "watch tours." [*Id.* at 7.] She worked twelve-hour shifts, sometimes with four hours of mandatory overtime. [*Id.* at 6.] Her work schedule alternated between one "short week" of only two shifts and one "long week" of five shifts. [*Id.* at 5.] On October 6, 2006, Ms. Eaton received a letter from Sergeant Jaynes commending her on her work performance. [Dkt. 61-1 at 6.] On January 18, 2007, Ms. Eaton received a performance evaluation, which stated "Ofc. Easton [sic] meets expectations at this review period." [Dkt. 61-8.] Throughout her employment at Pendleton, Ms. Easton suffered

---

[1] Unless otherwise indicated, the facts that follow are undisputed in the evidence submitted for the Motion for Summary Judgment. However, the Court notes that Ms. Eaton's testimony is somewhat internally inconsistent as to the sequence of events.

from back pain due to injury and illness; however, her pain did not initially prevent her from performing any aspect of her job. [Dkt. 49-1 at 3, 5.]

Sometime in the spring of 2007, Ms. Eaton was reassigned to work in Control Pod B, where she sat at a computer and monitored the comings and goings of residents and staff members. [Dkt. 49-1 at 10.] While in the control pod, she did not do any walking or have any physical contact with the residents. [Dkt. 61-1 at 2.] Although she was working in a new location, she kept her previous schedule of twelve-hour shifts, alternating between short and long weeks. [Dkt. 49-1 at 7.]

At some point while she was working in the control pod, Ms. Eaton left the pod and went down to the area where the residents of the facility were. [*Id.* at 16.] One of the residents threw urine into her face, so she asked her supervisor, Lieutenant Radendorf, for permission to go home and take a shower. [*Id.*] He refused her request, but told her she could go to the hospital. [*Id.*] Ms. Eaton went to the hospital, where she was advised that they could not do anything for her and that she "just needed to take a shower." [*Id.*] Ms. Eaton returned to work and again requested permission to go home and take a shower, but was not permitted to do so. [*Id.*]

Around September of 2007, Ms. Eaton received a warning for excessive absenteeism. [*Id.* at 6.] She was told that if she didn't improve her work attendance, she would be moved to a different schedule in which she would work five eight-hour shifts per week. [*Id.* at 5.] The new schedule would also include the possibility of mandatory four-hour overtime, meaning she "might have to work 12 hours every single day." [*Id.*] Ms. Eaton was ultimately placed on the eight-hour schedule as discipline for excessive absenteeism. [*Id.*]

On September 21, Ms. Eaton filed a grievance against the Indiana Department of Correction, stating that she felt the schedule change was unfair. [*Id.* at 8.] However, she was not

returned to her old schedule. [*Id.* at 9.] To avoid the physical and emotional stress of working five days every week for up to twelve hours per shift and dealing with four different lieutenants, she took FMLA leave for approximately the next four to eight weeks. [*Id.* at 5, 10.] At the time that she went on leave, she had never worked a shift under the new schedule. [*Id.* at 6.]

On or around November 26, Ms. Eaton returned to work at Pendleton. [*Id.* at 10.] She was again assigned to work in Control Pod B, and she was returned to her preferred schedule of twelve-hour shifts. [*Id.* at 6-8.]

Around this same time, Ms. Eaton was in a car accident and further injured her back. [*Id.* at 4.] Her doctor recommended some restrictions on her physical activity: she should refrain from excessive walking, lifting, bending, and twisting, and she should not lift any weight greater than ten pounds. [*Id.*] Additionally, she was not supposed to work any shift longer than twelve hours. [*Id.* at 8.]

On December 7, 2007, Ms. Eaton was reprimanded for failing to attend a mandatory training session. [Dkt. 49-1 at 13-14.] Ms. Eaton testified that the reprimand was the result of a miscommunication, but that she did not appeal it because she was told it was "taken care of." [*Id.* at 14.]

Sometime in December 2007, Ms. Eaton received a letter from Lieutenant Greenlee commending the entire staff of B complex on their work performance. [Dkt. 61-1 at 5.] Around the same time, Ms. Eaton informed her employer about her workplace restrictions. [Dkt. 49-1 at 11.] She told Lieutenants Sweat and Benshiemer about the restrictions. [*Id.*] Lieutenant Sweat told Ms. Eaton that if she turned the restrictions in to human resources, she would be switched to an eight-hour shift. [*Id.*] Ms. Eaton felt that she couldn't work eight-hour shifts, so she did not turn in her restrictions at that time. [*Id.*]

3

On January 4, 2008, Ms. Eaton had a disciplinary hearing for refusing overtime. [*Id.*] When she was asked why she had refused the overtime, she explained that her restrictions prohibited her from working more than twelve hours at a time. [*Id.*] Immediately after the hearing, she turned her restrictions in to the human resources department. [*Id.*]

Around the beginning of March 2008, at which time she was still working in Control Pod B [*id.* at 8], Ms. Eaton took some vacation time to visit her brother, who had been injured in an accident. [Dkt. 61-1 at 3.] While she was gone, another employee, Officer Dobbs, took her place in Control Pod B. [*Id.*] Officer Dobbs also had physical restrictions, but had less seniority than Ms. Eaton. [*Id.*] When Ms. Eaton returned to work, she was stationed in Control Pod D, which is more open to the residents than Control Pod B. [Dkt. 61-6 at 2.] That assignment only lasted one day, however; the next day, she was assigned to work a watch tour in Unit D-11, a unit that "housed lower risk inmates." [Id.; Dkt. 61-1 at 3.] Although she asked to be reassigned, she was still assigned to Unit D-11 for her next few shifts. [*Id.*] Officer Neal, Ms. Eaton's mother, offered to switch assignments with Ms. Eaton so Ms. Eaton could work in a control pod; however, Lieutenant Bensheimer did not permit them to switch. [Dkt. 61-3 at 2-3.]

On March 12, 2008, Ms. Eaton arrived at work and saw that she had been assigned to work in Unit E-16. [Dkt. 61-3 at 3.] Unit E-16, according to Ms. Eaton, is "the worst unit a correction officer can work." [Dkt. 61-1 at 3.] She became upset, and she and her mother spoke to Lieutenant Bensheimer. [*Id.*] Ms. Eaton stated she could not work that unit because of her restrictions, and Officer Neal offered to switch assignments with her so Ms. Eaton could work in a control pod. [*Id.*] Then Officer Neal went to her assigned area, and Ms. Eaton and Lieutenant Bensheimer continued to discuss the problem. [*Id.*]

4

Ms. Eaton called Officer Neal a few minutes later to report that "Officer Bensheimer had taken her belt and badge." [*Id.*] Soon afterward, Ms. Eaton called Pendleton to speak with Lieutenant Bensheimer, but was only able to reach Officer Neal. [Dkt. 49-1 at 18.] Officer Neal then called Lieutenant Bensheimer, who told her to come back and speak to him, which she did. [Dkt. 61-1 at 3.] Officer Neal again offered to switch assignments with Ms. Eaton and said that Ms. Eaton would return if she could work in a control pod, but Lieutenant Bensheimer said Ms. Eaton was upset and should go home and return on her next scheduled work day. [*Id.*; Dkt. 49-1 at 18.] Officer Neal spoke to Ms. Eaton on the telephone and reported Lieutenant Bensheimer's instruction. [Dkt. 61-1 at 3.] A few hours later, Lieutenant Bensheimer told Officer Neal that Ms. Eaton would not be permitted to return to work. [*Id.* at 3-4.] On her next work day, Ms. Eaton was told that she could not come into work, and she was subsequently fired. [Dkt. 61-1 at 4.]

Another correctional officer, Dennis Curtis, was employed at Pendleton from December 2006 until September 2007 and for at least part of his employment was under the direct supervision of Lieutenant Bensheimer. [Dkt. 61-2 at 2.] During his employment, Mr. Curtis was disciplined for "refusing to work overtime and for refusing to turn off a television while the inmates were being disciplined." [*Id.* at 3.] On one occasion, Mr. Curtis reported to work and was told by Officer Bensheimer that he was being reassigned to another unit. [*Id.* at 2.] Mr. Curtis refused the reassignment, but Officer Bensheimer insisted; Mr. Curtis then became angry, quit his job and left the facility. [*Id.* at 2-3.] After about forty-five minutes, he returned to work and was permitted to return to his job and his preferred unit without being disciplined. [*Id.* at 3.] On another occasion, a resident threw urine on Mr. Curtis. [*Id.*] He asked his supervisors,

Lieutenants Radendorf and Thompson, for permission to go home and take a shower. [*Id.*] He was permitted to do so. [*Id.*]

Ms. Eaton filed this action under the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12101 et seq.), Title VII (42 U.S.C. § 2000 et seq.), and the Family Medical Leave Act ("FMLA") (29 U.S.C. § 2601 et seq. and 28 U.S.C. § 1331). [Dkt. 1 at 1.] Pendleton moved for summary judgment on all claims. [Dkt. 48.] In her response to that motion, Ms. Eaton explicitly abandoned her claims under the ADA and the FMLA, leaving only her Title VII claim for gender discrimination at issue. [Dkt. 60 at 1.]

## DISCUSSION

A motion for summary judgment asks the Court to decide that a trial is unnecessary because the evidence supports only one conclusion—judgment for the moving party. Thus, before granting a motion for summary judgment, the Court must find that there is no dispute over the material facts and, based only upon those undisputed material facts, that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When deciding whether to grant the motion, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met that burden, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Summary judgment is proper only if the non-moving party cannot show such facts, or if she "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "It is not the district court's responsibility to seek out relevant information that a party has in its

possession." *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 476 (7th Cir. 2010) (noting that "[s]ummary judgment proceedings provide the "put up or shut up" moment in litigation.")

Ms. Eaton may prove her Title VII claim either by the direct method of proof or the indirect method, "although the distinction between the two methods is often fleeting." *Leonard v. Eastern Illinois University*, 606 F.3d 428, 431 (7th Cir. 2010) (quotations omitted).

## I. Indirect Proof

Ms. Eaton first argues that she has established a prima facie case for gender discrimination using the indirect method of proof [Plaintiff's Brief at 11-13], which the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "To make out a prima facie claim under *McDonnell Douglas*, a plaintiff must demonstrate that (1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment. *Everroad*, 604 F.3d at 477 (citations omitted).

Both parties in this case agree that Ms. Eaton meets the first criterion because she is a woman. [Plaintiff's Brief at 11; Defendant's Brief at 15.] There is a dispute as to the second and third criteria: Ms. Eaton claims that she was a satisfactory employee and that she was fired, but Pendleton maintains that her performance was unsatisfactory and that she quit. [Plaintiff's Brief at 11-12; Defendant's Brief at 16.] For the purposes of the Motion for Summary Judgment, the Court assumes without deciding that Ms. Eaton was both a satisfactory employee and that she was fired, because as shown above, the resolution of that question is irrelevant, as she does not satisfy the fourth criterion.

Ultimately, "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (citation omitted). In particular, for the purposes of the instant case, the Court notes that "[w]ithout a similar disciplinary history, [the comparator] cannot be considered 'similarly situated.'" *Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). "Although whether a comparator is similarly situated is usually a question for the fact-finder, summary judgment is appropriate when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009) (citing *McDonald v. Village of Winnetka*, 371F.3d 992, 1002 (7th Cir. 2004)).

Ms. Eaton proffers two other employees whom she alleges are similarly situated to her but were treated more favorably: Mr. Curtis and Mr. Dobbs. [Plaintiff's Brief at 13, 15.]

### A. Mr. Curtis

In her argument that Mr. Curtis is similarly situated to her, Ms. Eaton points to two specific incidents: the day that Mr. Curtis briefly quit and then returned to work in response to an assignment he considered undesirable, and the day that one of the residents threw urine on Mr. Curtis and Lieutenant Bensheimer allowed him to go home and shower. [*Id.* at 14-15.] Pendleton argues that Mr. Curtis isn't similarly situated to Ms. Eaton because he had not been previously disciplined for attendance reasons, he had not previously refused to work 8-hour shifts and then taken leave because he didn't get his way [Defendant's Reply at 3], and he had not refused particular shifts or duties multiple times [*Id.* at 4].

As to the comparison that Ms. Eaton draws between her final day at Pendleton and the day that Mr. Curtis quit and briefly walked off the job without consequences, the Court finds several differences between the two situations. First, according to Ms. Eaton's version of events (which, for the purposes of the Motion for Summary Judgment, the Court accepts as true), Ms. Eaton never actually quit. [Plaintiff's Brief at 5.] Instead, she went home in compliance with her supervisor's instruction and was fired a few days later. [*Id.*] Additionally, when Mr. Curtis left the facility, there is no evidence that he turned in his belt and badge. Ms. Eaton, on the other hand, did turn in her belt and badge when she left. [*Id.*] Finally, Mr. Curtis returned to work after less than one hour and resumed working. [Dkt. 61-2 at 3.] In contrast, Ms. Eaton did not return to Pendleton until her next scheduled shift, which was at least twenty-four hours later.[2] [Dkt. 61-1 at 3.] Although Ms. Eaton called Officer Bensheimer shortly after she left the facility, she never actually spoke to him directly, and thus had no opportunity to ask if she could come back to work. [Dkt. 49-1 at 18.] Based on these differences, the Court finds Ms. Eaton's conduct and Mr. Curtis's conduct are too dissimilar for any reasonable fact-finder to conclude that the two employees are similarly situated.

Additionally, the Court notes that there are substantial differences between Ms. Eaton's disciplinary history and Mr. Curtis's disciplinary history. Ms. Eaton and Mr. Curtis were both disciplined for refusing overtime, but that is the extent of the similarity between their disciplinary histories. [Dkt. 49-1 at 11; dkt. 61-2 at 3.] Ms. Eaton was both warned and subsequently disciplined for excessive absenteeism, but Mr. Curtis was not. [Dkt. 49-1 at 5-6.] Ms. Eaton was reprimanded for failing to attend a mandatory training session, but Mr. Curtis was not. [*Id.* at 13-14.] Although Mr. Curtis was disciplined for refusing to turn off a television [dkt.

---

[2] Like many of the other events in this chronology, the exact length of time between March 12, 2008 and the date of Ms. Eaton's next scheduled shift is uncertain.

61-2 at 3], that was an infraction that occurred while he was on the job. In contrast, Ms. Eaton's disciplinary history shows that virtually all of her infractions had to do with not being at work when she was supposed to be. Because his disciplinary history is so different from hers, the Court finds that Mr. Curtis is not a comparator for the purposes of Ms. Eaton's claim.

Ms. Eaton also complains that Mr. Curtis was treated more favorably because he was allowed to go home and shower after a resident threw urine on him, but when she suffered the same indignity, she was not allowed to go home and shower.[3] [Plaintiff's Brief at 14-15.] Pendleton asserts that facility staffing needs are variable and subject to security considerations, and suggests that Ms. Eaton may have been required to remain on duty for the safety of the other employees [Defendant's Brief at 3], although there is no evidence before the Court to support that assertion. However, the Court notes that Mr. Curtis was supervised by two lieutenants, Radendorf and Thompson, at the time that he had urine thrown on him, and it is unclear which of them allowed him to go home. [Dkt. 61-2 at 3.] When Ms. Eaton had urine thrown on her, she was supervised entirely by Lieutenant Radendorf, who did permit her to go to the hospital. [Dkt. 49-1 at 16.] Because Ms. Eaton is the non-moving party, the Court makes all reasonable inferences in her favor and thus assumes without deciding that these two incidents involved identical decision-making personnel. However, because of the differences in their disciplinary histories as shown above, the Court nevertheless finds that Mr. Curtis is not similarly situated to Ms. Eaton.

---

[3] Ms. Eaton does not connect either of these incidents to the adverse employment action she alleges. Nonetheless, the Court will consider them to the extent that they provide background information for Ms. Eaton's claim that she and Mr. Curtis are similarly situated with respect to the events that led to her termination.

10

### B.  Mr. Dobbs

As to Mr. Dobbs, the Court notes that Ms. Eaton has not offered any evidence about his disciplinary history.  She merely alleges that Pendleton accommodated his health-related work restrictions by assigning him to work in a control pod, and that he had less seniority than she did.  [Dkt. 61-1 at 3.]  However, she hasn't provided any evidence to show that he was always assigned to a control pod.  According to her testimony, he was assigned there the day that she returned from her vacation time, but there is no evidence to show that he worked there before or after that day.  [*Id.*]  Additionally, Ms. Eaton also worked in a control pod after she submitted her work restrictions to the Pendleton human resources department on January 4, 2008.  [Dkt. 49-1 at 8.]  According to her own testimony, she worked in the control pod from the spring of 2007 until early March of 2008, after she returned from a few days of vacation.  [*Id.*]  Therefore, Pendleton also accommodated her restrictions, at least to some extent.  It is true that she was reassigned to watch tours beginning in early March of 2008 [dkt. 61-6 at 2; dkt. 61-1 at 3], but regardless of that fact, Ms. Eaton has failed to meet the required standard for comparator evidence:  that she was treated differently than a similarly situated male employee, or in other words, that Pendleton accommodated Mr. Dobbs's restrictions but failed to accommodate hers.

### II.  The Direct Proof Standard

Ms. Eaton also argues that she has established a prima facie case of gender discrimination under the direct proof method.  [Plaintiff's Brief at 14-15.]  The direct method requires "evidence of (1) a statutorily protected activity [or status]; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Leonard*, 606 F.3d at 431 (quotations omitted).

11

To show a causal connection between the protected status and the adverse employment action, a plaintiff can offer either direct evidence (for example, a defendant's admission of discriminatory intent) or circumstantial evidence "Circumstantial evidence, unlike direct evidence, need not directly demonstrate discriminatory intent, but rather it allows a jury to infer intentional discrimination by the decisionmaker from suspicious words or actions." *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 861 (7th Cir. 2007) (quotations omitted).

Here, Ms. Eaton argues that a jury could infer such discriminatory intent based on her allegation that other "similarly situated" male employees were treated better than she was. [Plaintiff's Brief at 14.]  This is a valid type of circumstantial evidence under the direct method of proof.  *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 851 (7th Cir. 2010) (explaining the overlap between the use of a similarly situated comparator as one type of circumstantial evidence in the direct method of proof and as a required element of the indirect method of proof).

However, assuming *arguendo* that Ms. Eaton satisfies the first two criteria of the direct method of proof, her claim would nevertheless fail under the third criterion.  As shown above, she has not identified a "similarly situated" employee.  Therefore, she is unable to establish a prima facie case of discrimination under the direct method of proof.

## CONCLUSION

The Court finds that Ms. Eaton has failed to establish a prima facie case of gender discrimination under Title VII. The Motion for Summary Judgment is **GRANTED**.

09/03/2010

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Laura Lee Bowker
OFFICE OF THE INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com